

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4392 | **DATE** | 9/27/2001 |
| **CASE TITLE** | RICHARD FEINGOLD vs. ASSOCIATED INS. COMPANIES, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____.  Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56 is granted [23-1].  This case is hereby terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | SEP 2 8 2001 | | |
| | Notified counsel by telephone. | | date docketed | | 44 |
| ✓ | Docketing to mail notices. | | *EB* | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| ✓ | Copy to judge/magistrate judge. | FOR DOCKETING SEP 27 PM 5: 12 | date mailed notice | | |
| TBK | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RICHARD FEINGOLD, Individually,    )
and ex rel. UNITED STATES OF AMERICA,  )
    )
Relator,    )
    )
    )    No.   98 C 4392
    )
v.    )
    )    Judge Ronald A. Guzmán
ASSOCIATED INSURANCE COMPANIES,  )
INC., ADMINASTAR, INC., ADMINASTAR  )
FEDERAL, INC., JOHN DOE and JANE DOE,  )
    )
Defendants.    )

DOCKETED
SEP 2 8 2001

## MEMORANDUM OPINION AND ORDER

This matter is now before the Court on Defendants, Associated Insurance Companies, Inc., AdminaStar, Inc., AdminiStar Federal, Inc., John Doe, and Jane Doe's ("Defendants") motion for summary judgment pursuant to Fed. R. Civ. P. Rule 56. Richard Feingold ("Relator") brought suit against Defendants on behalf of the United States of America alleging that Defendants violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3732 (1982) by approving fraudulent Medicare claims with reckless disregard of the falsity of those claims. For the reasons stated below, the Court grants Defendant's motion for summary judgment and hereby terminates this case.

## BACKGROUND FACTS

Relator has filed a complaint pursuant to the *qui tam* provisions of the FCA. Relator alleges that Defendants approved false claims in reckless disregard of the falsity of those claims. (*Compl.* ¶¶ 27, 31, 33, 35, 37, 41.) In approximately January of 1993, Defendants contracted

1

with the Healthcare Financing Administration ("HCFA") to act as the durable medical equipment regional carrier ("DMERC") for Region B. (*Relator's Statement of Uncontested Facts* ¶ 1.) As the Region B DMERC, Defendants were to pay claims that were reimbursable under Medicare and which provided reasonable and necessary services. (*Id.* ¶ 3.)

From January 1994 to March 11, 1994, Relator worked for and was co-owner of a medical supply company, Illiana Medical ("Illiana"). (*Id.* ¶ 20.) During this time, Relator did all of the billing and submitted all of the claims for Illiana. (*Id.* ¶ 21.) While doing the billing for Illiana, Relator submitted claims to Defendants for adult diapers under Medicare codes that did not correspond to the supplies provided. (*Id.* ¶¶ 22-24.) On March 11, 1994, Relator received a fraud alert issued by Defendants which stated that adult diapers were not reimbursable by Medicare. (*Id.* ¶ 23.) On March 11, 1994, Relator quit working for Illiana and returned his stock to the company because he was concerned that Illiana was going to continue to submit improper claims. (*Id.* ¶ 24.)

Relator was "quite sure" that the diapers supplied by Illiana and another medical supply company were not items that were properly reimbursable under Medicare. (*Id.* ¶ 25.) Relator contacted people within the medical supply and medical industry and learned that the diapers provided by Illiana and the other medical supply company were not billable under Medicare. (*Id.* ¶ 28.) Relator filed lawsuits pursuant to the *qui tam* provision in the FCA against Illiana and the other medical supply company for making fraudulent claims under Medicare. (*Id.* ¶¶ 31, 33.) Both of the suits settled for substantial sums. (*Id.* ¶¶ 32, 34.)

In January and March of 1994, Defendants received fraud alerts notifying them of the possible fraudulent billing of certain supplies, including diapers. (*Id.* ¶¶ 35-40.) After the fraud

alerts were issued in January and March of 1994, Defendants continued to approve a large number of claims for codes that were the subject of the fraud alerts. (*Id.* ¶¶ 53, 61, 63, 71.) In approximately July of 1998, Relator read a newspaper article covering the indictment of two individuals for improperly billing Medicare for the supplies that were the subject of the 1994 fraud alerts. (*Def.s' Statement of Uncontested Facts* ¶ 10.) Relator and his attorney then obtained the actual criminal indictments of the two individuals discussed in the July 1998 newspaper article. (*Id.*) Relator also obtained a statistical report from HCFA detailing the number of claims approved by Defendants under the questionable codes. (*Id.*) Relator filed the instant suit against Defendants in 1998 alleging that Defendants approved the questionable claims in reckless disregard for their falsity.

## STANDARD FOR MOTION FOR SUMMARY JUDGMENT

A movant is entitled to summary judgment under Rule 56 where the pleadings, together with any affidavits and admissible evidence in the record, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986); *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1209 (7th Cir. 1993). Before a court denies summary judgment, it must be determined whether there is sufficient evidence from which a jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-250 (1986).

The court's function on a motion for summary judgment is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue of material fact for trial. The party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is

a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 324.

## DISCUSSION

Relator alleges that Defendants violated the FCA by approving claims with reckless disregard as to the falsity of the claims. Defendants have moved for summary judgment arguing that this Court has no jurisdiction over Relator's claims because Relator's suit is based on publicly disclosed allegations or transaction for which Relator is not an original source. The FCA contains a jurisdictional bar to *qui tam* lawsuits based on publicly disclosed allegations of fraud which the relator was not an original source of.

Some background history of the FCA is necessary before proceeding on to Defendants' motion for summary judgment. The FCA is a Civil War era statute originally enacted by Congress in 1863 "to punish and deter the fraudulent claims of war profiteers." *United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 857 (7th Cir. 1999). The FCA contains *qui tam* provisions where a private party (a "relator") may bring a suit alleging that fraud was committed on the government. *Id.*

Congress has amended the *qui tam* provisions twice, once in 1943 and most recently in 1986. *Id.* at 858. As originally enacted, the FCA allowed a relator to "bring a *qui tam* action based entirely upon information contained in an indictment to which [the relator] had contributed nothing." *Id.* This led to abuse and to what have been termed "parasitic lawsuits," or lawsuits brought by opportunistic relators alleging fraud based upon public information that the relator played no part in uncovering. *See Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, 19 F.3d 562, 565 (11th Cir. 1994) (citations omitted). In 1943, Congress amended the FCA's *qui tam* provisions to preclude lawsuits brought by relators "based on evidence or information the

4

government had when the action was brought." *United States ex rel. Mathews*, 166 F.3d 853, 858 (internal quotations and citations omitted). This led to harsh results where a relator's *qui tam* action would be barred even though the relator had provided the information to the government. *Id.* (citing *United States ex rel. State of Wis. v. Dean*, 729 F.2d 1100, 1103 (7th Cir. 1984)).

In 1986, Congress amended the FCA's *qui tam* provisions with the dual purpose of "encouraging people to come forward with information" and "preventing parasitic lawsuits." *Cooper*, 19 F.3d at 565 (citations omitted). Congress established a "jurisdictional" bar against certain actions. *United States ex rel. Mathews*, 166 F.3d at 858. Sections 3730(e)(4)(A) and 3730(e)(4)(B) of the FCA provide:

> (A) No court shall have jurisdiction over an action under this section based upon the public disclosures of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government [sic] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

> (B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. §§ 3730(e)(4)(A) and 3730 (e)(4)(B).

"Congress intended that the courts not be troubled by persons who wish to capitalize on others' discovery of frauds to the exposure of which they themselves in no way contributed." *United States ex rel. Mathews*, 166 F.3d at 858. "[T]he jurisdictional bar is not to be excessively construed" and the provisions should be "understood in the context of the 1986 amendments,

5

which . . . broaden the *qui tam* provision, increasing incentives for the exposure of fraud." *Id.*
With this background in mind, the Court addresses Defendants' motion for summary judgment.

Defendants move for summary judgment arguing that the jurisdictional bar in the FCA bars Relator's *qui tam* action and that Relator has failed to satisfy Fed. R. Civ. P. 9(b). The Court will address the jurisdictional argument first. The Seventh Circuit has adopted a three pronged test to determine whether a court has jurisdiction to hear a *qui tam* relator's claim under the FCA. *See United States ex rel. Matthews* 166 F.3d 853, 859 (7th Cir. 1999) (citing *Cooper*, 19 F.3d at 564 n.4). First, the court must determine whether the allegations made by the relator have been "publicly disclosed." *Id.* at 859. If the allegations have been publicly disclosed, the court must determine whether the relator's lawsuit is "based upon" that publicly disclosed information. *Id.* If the relator's lawsuit is based upon the publicly disclosed information, the court must determine whether the relator is an "original source" of the information. *Id.* A court does not have jurisdiction over a *qui tam* action only when the relator's lawsuit is based upon publicly disclosed allegations or transactions and when the relator is not an original source of the publicly disclosed information. *Id.*

1.)  <u>Have the allegations made by Relator against Defendants been "publicly disclosed"?</u>

Defendants argue that the allegations or transactions contained in Relator's complaint were "publicly disclosed" in the following documents:

    1.)  HCFA and HHS Fraud Alerts released in 1994;

    2.)  A newspaper article read by Relator in July of 1998 concerning the indictment of two individuals for billing Medicare for diapers;

    3.)  The actual criminal indictments of those two individuals;

4.)     HCFA statistical printouts obtained by Relator showing the number of allegedly improper claims approved by Defendants; and

5.)     Previous Government litigation against Relator's former company.

*(Def.s' Memo. in Support of Summ. J. ("Def.s' Memo.") at 4.)*

In response, Relator argues that there have not been any publicly disclosed allegations of fraud against Defendants because "the Government has represented that it is unaware of the existence of any public disclosures as to" Defendants. *(Relator's Memo. in Support of his Resp. to Def.s' Mot. for Summ. J. ("Relator's Resp. Memo.") at 4; Relator's Statement of Uncontested Facts ¶ 41.)* Sometime after July 1998, a Department of Justice Attorney informed Relator's counsel "that she was unaware of any public disclosures as to Defendants." *(Aff. of Sidney R. Berger ¶ 7.)* Relator points to no authority to support its contention that allegations or transactions have not been publicly disclosed where a representative of the Government is unaware of any public disclosures of allegations or transactions. This definition of "public disclosure" conflicts with the text of the FCA and conflicts with the Seventh Circuit's interpretation of public disclosure. This Court finds Relator's argument unpersuasive. An allegation or transaction can be publicly disclosed under the FCA even where a representative of the Government is unaware of any public disclosures.

Next, Relator argues that even if the *documents* were publicly disclosed, they do not contain "allegations or transactions" within the meaning of the FCA and that the jurisdictional bar is not raised. *(Relator's Resp. Memo. at 5.)* Relator argues that the publicly disclosed documents "did not address the conduct of [Defendants] in any way" and that the documents "do not even indirectly intimate wrongdoing by (let alone implicate) the Defendants in the" current

matter. (*Id.* at 5, 8-9.) Relator argues extensively that since the publicly disclosed documents do not specifically name Defendants, that no "allegations or transactions" concerning Defendants have been publicly disclosed. (*Id.* at 9.) Relator argues correctly that the jurisdictional bar is raised only where *allegations* or *transactions* of fraud (as opposed to mere innocuous information) have been publicly disclosed. (*Id.* at 5-8.) Relator argues that the publicly disclosed documents contain only innocuous "information" concerning the wrongdoing of medical suppliers as opposed to allegations or transactions concerning Defendants' alleged fraud. (*Id.* at 6.)

Although Relator does not directly challenge Defendants' assertion that the documents themselves were publicly disclosed within the meaning of the FCA, this Court will, as a preliminary matter, determine whether the documents have been "publicly disclosed" within the meaning of the FCA.

The newspaper article read by Relator in July of 1998 clearly has been publicly disclosed within the meaning of the FCA. *See* 31 U.S.C. § 3730(e)(4)(A) (making allegations or transaction contained in "the news medica" publicly disclosed). In addition, the criminal indictments of the two individuals obtained by Relator were publicly disclosed for the purposes of the FCA. *See United States ex rel. Springfield Terminal Ry. Co. v Quinn*, 14 F.3d 645, 652 (D.C. Cir. 1994) (concluding, in dictum, that criminal indictments would be "public disclosures" because "[i]t is clear from statutory context that the term "hearing" was intended to apply in a broad of legal proceedings under § 3730(e)(4)(A)."); *United States ex rel. Stinson, Lyons, Gerlin & Bustamente, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1155 (3d Cir. 1991) (concluding, in dictum, that a criminal indictment would constitute a "public disclosure" within the meaning of

the FCA).

The Documents obtained by Relator through his previous *qui tam* lawsuits are publicly disclosed if they are on file in a clerk's office and actually available to the public. *See United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 860-61 (7th Cir. 1999). Relator does not challenge Defendants' characterization of the documents obtained in the previous *qui tam* suits as publicly disclosed and does not cite any evidence suggesting that the documents obtained in the previous litigation were not filed with the clerk's office and actually available to the public. (*Relator's Resp. Memo.* at 3.)

The HCFA and HHS fraud alerts released in 1994 and the HCFA statistical printouts obtained by Relator have also been publicly disclosed within the meaning of the FCA. HCFA is a federal "administrative" agency and issued the fraud alerts and statistical printouts are "reports" within the meaning of the FCA. *See United States ex rel. Mistick PBT v. Hous. Auth. of Pittsburgh*, 186 F.3d 376, 383-84 (3d Cir. 1999) (holding that something is an "administrative report" if it originated in a department of the federal government and constituted official government action giving information or notification); *see also United States ex rel. Coleman v. State of Ind.*, 2000 U.S. Dist. LEXIS 13666, at *29 (S.D. Ind. Sept. 19, 2000). The HCFA fraud alerts and HCFA statistical reports[1] were actually as opposed to theoretically opened up to view by the public. *See United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 860-61 (7th Cir. 1999). In addition, where the information has been disclosed to a public official

---

[1] In an unpublished opinion of questionable precedential value, the Sixth Circuit determined that HCFA reports detailing billing transactions were publicly disclosed within the meaning of the FCA. *See United States ex rel. Branhan v. Mercy Health Sys. of S.W. Ohio*, 1999 U.S. App. LEXIS 18509, at *5 (6th Cir. August 5, 1999).

responsible for handling that information, there has been a public disclosure within the meaning

of the FCA. *Id.* at 861. *See also U.S. ex re. Dhawan v. New York Medical College,* 252 F. 3d

118, 121-122 (2nd. Cir. 2001) and *U.S. ex rel. O'Keefe v. Sverdup Corp.,* 131 F. Supp. 2d 87, 95

(D. Ma. 2001). In this case, HCFA is responsible for administering the Medicare laws. The

information contained in the fraud alerts and in the statistical reports were publicly disclosed

because HCFA, the agency responsible for administering Medicare, was actually the *source* for

the information. *See also United States ex. rel. Springfield Terminal Railway v. Quinn,* 14 F.3d

645, 654 (D.C. Cir. 1994) (holding that "there is no place in the [FCA's] enforcement scheme for

*qui tam* suits" where the government possesses enough information to determine whether to

bring a fraud claim under the FCA). This Court holds that the documents in question have all

been publicly disclosed within the meaning of the FCA.

  As stated above, Relator primarily argues that even if the documents have been publicly

disclosed under the FCA, they do not contain "allegations or transaction"of fraud and do not raise

the jurisdictional bar under the FCA. Relator also argues that no allegations or transactions of

fraud have been publicly disclosed because the documents do not specifically name Defendants.

  The FCA's jurisdictional bar applies only where "allegations or transactions" have been

publicly disclosed and not where mere innocuous information alone has been publicly disclosed.

*See* 31 U.S.C. § 3730(e)(4)(A); *United States ex rel. Springfield Terminal Ry. Co. v Quinn,* 14

F.3d 645, 652 (D.C. Cir. 1994) (the FCA "bars suits based on publicly disclosed 'allegations or

transactions,' not information") (citations omitted). However, explicit and specific allegations of

fraud need not be publicly disclosed in order for the jurisdictional bar to be raised. *See United*

*States ex rel. Springfield Terminal Ry. Co.,* 14 F.3d at 654. Allegations or transactions may be

publicly disclosed where "the *critical elements* of the fraudulent transaction . . . were in the public domain" such that "the public could infer . . . the conclusion that fraud has been committed." *Id.* at 654 (emphasis added). Where "the only publicly disclosed information was itself innocuous" the jurisdictional bar is not raised. *Id.* Thus, this Court must determine whether the publicly disclosed documents contained merely innocuous information or whether they contained "the critical elements of the fraudulent transaction" from which the public could "infer . . . the conclusion that fraud has been committed." *Id.*

In *Springfield Terminal Railway*, the Court of Appeals for the District of Columbia formulated an equation to illustrate what type of information needs to be publicly disclosed in order to be considered "allegations or transaction" within the meaning of the FCA. *Id.* at 654.

> [I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.,* the conclusion that fraud has been committed. The language employed in § 3730(e)(4)(A) suggests that Congress sought to prohibit *qui tam* actions *only* when either the allegation of fraud or the critical elements of the fraudulent transaction themselves were in the public domain.

*Id.* (emphasis in original). The court concluded that Congress intended

> to create a standard under which *qui tam* actions are barred only when enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y), or the allegation of fraud (Z). When either of these conditions is satisfied, the government itself presumably can bring an action under the FCA and there is no place in the enforcement scheme for *qui tam* suits.

*Id.* While the Seventh Circuit has not expressly adopted this approach, it has not articulated its own analysis for determining when an "allegation or transaction" has been publicly disclosed for the purposes of the FCA. The equation formulated in *Springfield Terminal Railway* offers a useful guide, and this Court will utilize it in the current matter.

11

Using the *Springfield Terminal Railway* formulation, Relator argues that the "alleged scheme" that Defendants engaged in was "X" and that Defendants' "precise transactions" were "Y." (*Relator's Resp. Memo.* at 9.) Relator argues that "Z" (the allegation of fraud against Defendants), or the necessary combination of "X" and "Y" have not been publicly disclosed. (*Id.*)

Keeping in mind that *Springfield Terminal Railway*'s formulation is only a guide, this Court disagrees. Relator's Complaint essentially alleges that Defendants approved certain claims with reckless disregarded as to the falsity of those claims ("Z"). Relator alleges that Defendants recklessly disregarded the falsity of certain claims because Defendants should have known that those claims were potentially fraudulent in light of HCFA and HHS fraud alerts released in 1994. In this case, "X" and "Y" have been publicly disclosed and there was enough information from which the public or the Government could infer the existence of possible fraudulent claims being approved by Defendants. "X" is the fact that HCFA and HHS fraud alerts should have alerted Defendants to the potential for fraudulent claims under certain codes. "Y" is the fact that Defendants continued to approve those questionable code numbers in high volumes after the fraud alerts were released in 1994. "X" was publicly disclosed in 1994 in the form of the HCFA and HHS fraud alerts. "X" was publicly disclosed by HCFA in 1998 in the statistical reports that it released showing the number of claims that Defendants approved under the questionable code. The publicly disclosed documents (specifically, the fraud alerts and the HCFA statistical reports) contained sufficient information from which the public could conclude that Defendants were recklessly disregarding the falsity of the claims they were processing.

The "allegations or transactions" at the heart of this lawsuit have been publicly disclosed. There was enough information in the public domain from which the public or Government

officials responsible for administering the Medicare laws could infer that Defendants were recklessly disregarding the falsity of certain claims submitted under codes that were the subject of HCFA and HHS fraud alerts.

Relator also argues that any public disclosures that have been made do not specifically "name or implicate the Defendants in any way" and concludes from this that the allegations have not been "publicly disclosed" for the purposes of the FCA. (*Relator's Resp. Memo.* at 11.) Other courts addressing this issue have held that public disclosures need to "specifically name[] or otherwise directly identif[y]" the defendants in order for the jurisdictional bar to be raised. *Cooper v. Blue Cross and Blue Shield of Florida*, 19 F.3d 562, 566 (11th Cir. 1994); *see also United States ex rel. Aflatooni v. Kitsap Physicians Services*, 163 F.3d 516, 523 (9th Cir. 1999). However, the allegations need not *specifically name* Defendants if they are directly identifiable from the publicly disclosed documents. *See United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675, 687 (D.C. Cir. 1997) (holding that a public disclosure occurred where there was enough information in the public domain to identify defendants and their allegedly fraudulent transactions); *Cooper*, 19 F.3d at 566 (holding that public disclosures that directly identify the defendants are sufficient to raise the jurisdictional bar); *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568, 571-72 (10th Cir. 1995) (holding that a public disclosure occurred in where identity of defendants was ascertainable from report that failed to specifically name defendants).

Relying on *Cooper v. Blue Cross and Blue Shield of Florida*, 19 F.3d 562 (11th Cir. 1994), Relator argues that the information contained in the publicly disclosed documents disclose only general allegations of widespread fraud within the entire industry and that this is insufficient

to raise the jurisdictional bar. In *Cooper*, the court held that the information in the public domain did not contain sufficient information to be considered allegations or transaction under the FCA because the defendants in that case were not identifiable from the publicly disclosed information. *Id.* at 566. The *Cooper* court emphasized that there is no publicly disclosed allegation where the defendants are not named and where the Government "has difficulty identifying all of the individual actors engaged in the fraudulent activity." *Id.* *Cooper* is distinguishable from the current matter because Defendants *are* directly identifiable from the publicly disclosed documents. The HCFA statistical reports showing the number of questionable codes approved during the years 1994, 1995, 1996, and 1997 include a column labeled "CARRIER." There is a five digit number ("00635") in this column which Relator has circled. Presumably, this number identifies Defendants. Otherwise Relator would not be able to repeatedly refer to the HCFA statistical reports to support his claims that Defendants continued to authorize payments for certain codes. (*Relator's Statement of Uncontested Facts* ¶¶ 53, 54, 61, 62, 63, 64, 71, 72.) Relator cannot have it both ways. He cannot claim that the HCFA statistical reports do not identify Defendants while at the same time use those same reports as evidence for the number of claims specifically approved by Defendants. If the HCFA statistical reports do not directly identify Defendants, then Relator would have no idea how many claims Defendants approved from 1994 through 1997. The HCFA statistical reports sufficiently identify Defendants in order to trigger the statutory jurisdictional bar. The publicly disclosed allegations or transactions contain enough information from which the public or Government officials responsible for administering Medicare could infer that Defendants were approving claims with reckless disregard as to the falsity of those claims.

14

The fact that a member of the general public without knowledge of the medical supplies industry would not be able to read the information contained in the Documents and conclude X and Y does not mean that the Documents do not contain the critical elements of fraud. "Expertise in [a particular field] would not in itself give a *qui tam* plaintiff the basis for suit when all the material elements of fraud are publicly available, though not readily accessible to nonexperts." *United States ex rel. Springfield Terminal Ry. Co.*, 14 F.3d at 655 (citing *United States ex rel. Stinson, Lyons, Gerlin & Bustamente, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1160 (3d Cir. 1991). In the current matter, all of the information necessary to conclude that Defendants had processed claims in reckless disregard for the falsity of those claims is contained in the publicly disclosed documents. The allegations of fraud against Defendants or alleged fraudulent transactions engaged in by Defendants have been publicly disclosed for the purposes of the FCA.

2.) <u>Is Relator's lawsuit "based upon" the publicly disclosed information?</u>

The FCA requires that a *qui tam* relator's lawsuit must be "based upon" publicly disclosed allegations or transaction in order for the jurisdictional bar to be raised. 31 U.S.C. § 3730(e)(4)(A). Addressing this requirement, the Seventh Circuit has held that the jurisdictional bar only applies where the relator's *qui tam* action is "derived from" the publicly disclosed information.[2] *United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d 853, 863 (7th Cir.

---

[2] This interpretation of "based upon" is in conflict with the interpretation advanced by the majority of other circuits. *See, e.g., United States ex rel. Mistick PBT v. Housing Auth. of Pittsburgh*, 186 F.3d 376 (3d Cir. 1999); *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997). These circuits hold that a *qui tam* action is barred where the allegations in the relator's complaint are identical or similar to allegations that have been publicly disclosed, regardless of whether the relator obtained his information from the information in his action. *See United States ex rel. Mathews v. Bank of Farmington*, 166 F.3d

15

1999). "[A] claim which both depends essentially upon publicly disclosed information and is actually derived from such information is 'based upon' a public disclosure for purposes of § 3730(e)(4)(A)." *Id.* at 864. In *United States ex rel. Mathews*, the Seventh Circuit held that the lawsuit in question was based upon publicly disclosed transactions because the publicly disclosed information was "part of [the relator's] claim, [was] cited in her complaint, and [was] necessary to show that the" defendant had allegedly committed fraud. *Id.* at 863.

Relator argues that his lawsuit cannot be "based upon" publicly disclosed information because none of the public disclosures contain specific allegations of wrongdoing against Defendants. (*Relator's Resp. Memo.* at 13.) Arguing that his "assertions [contained in the Complaint] go beyond that which was contained in any alleged public disclosures," Relator concludes that his lawsuit is not "based upon" the publicly disclosed allegations. (*Id.*) Relator misunderstands and misapplies the meaning of "based upon" as interpreted by the Seventh Circuit. In addition, Relator's argument that his lawsuit cannot be derived from the publicly disclosed allegations because Defendants were not specifically named is unpersuasive. As noted above, the publicly disclosed documents provided sufficient information to *directly identify* Defendants.

Following the Seventh Circuit's decision in *United States ex rel. Mathews*, this Court holds that Relator's lawsuit was based upon (derived from) the publicly disclosed documents. In this case, Relator attached a "National Medicare Fraud Alert" from January 26, 1994, to his complaint. (*Compl. Ex.* 2.) Relator also references statistics apparently culled from the HCFA statistical reports he obtained in 1998. (*Id.* ¶¶ 25, 28.) For example, in his Complaint Relator

---

853, 863 (7th Cir. 1999) (reviewing cases that follow the majority definition of "based upon").

alleges that in 1998 Defendants approved in excess of 137,000 questionable claims at a cost of $898,000 to Medicare. (*Id.* ¶ 28.) The HCFA statistical report obtained by Relator in 1998 shows that the carrier coded "00635" approved over 137,000 claims of the type described in Relator's Complaint at a cost of $876,416. (*Relator's Statement of Uncontested Facts* ¶ 53 and *Ex.* R.) Relator has not provided any other evidence from which these statistics could be derived (except for the publicly disclosed HCFA statistical reports).

The information comprising the publicly disclosed allegations was cited in Relator's Complaint, was part of Relator's claim, and was necessary to show that Defendants allegedly committed fraud. Without the HCFA statistical printouts detailing how many claims were approved by Defendants, Relator would not have any information or evidence showing that Defendants continued to approve questionable claims in high numbers after the fraud alerts were released. Hence, Relator's lawsuit is "based upon" publicly disclosed information and allegations for the purposes of § 3730 (e)(4)(A).

3.)     Is Relator an "original source" of the information?

Since the Court has determined that Relator's lawsuit is based upon publicly disclosed allegations, the Court must determine whether Relator is an "original source" of the information on which the allegations are based within the meaning of the FCA. *See United States ex rel. Mathews*, 166 F.3d at 864. In order to be an "original source" Relator must have "direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government before filing an action under [the FCA *qui tam*

provisions] which is based on the information." 31 U.S.C. § 3730 (e)(4)(B).[3] In order to qualify

as an "original source" for the purposes of the FCA, Relator must satisfy two requirements: 1.)

Relator's knowledge must be "direct;" and 2.) Relator's knowledge must be "independent" of the

public disclosures. *See United States ex rel. Mathews*, 166 F.3d at 864.

Relator is not an "original source" under the FCA because he does not have direct or

independent knowledge of the allegations as the basis of *this* lawsuit. The Seventh Circuit has

not specifically define what type of knowledge would be "direct" for the purposes of the FCA. In

*United States ex rel. Houck v. Folding Carton Administration Committee*, 881 F.2d 494, 505 (7th

Cir. 1989), the court held that the "direct" knowledge requirement was satisfied where the relator

had assisted claimants file claims from a fund that the relator had alleged had violated the FCA.

*Id.* at 505. Other courts have held that a relator's knowledge is "direct" where it is "unmediated

by anything but his own labor" and where the relator "saw it with his own eyes." *United States

ex rel. Aflatooni v. Kitsap Physician Services*, 163 F.3d 516, 524 (9th Cir. 1998) (citations

omitted). During his deposition, Relator acknowledged that the only direct knowledge that

he had was knowledge relating to "claims filed by Illiana . . . prior to March 15, 1994."

*(Relator's Dep.* at 117.) While this may be direct knowledge of fraud perpetrated by Illiana, it is

not direct knowledge concerning the allegations of fraud made by Relator against Defendants.

Relator argues that he is an "original source" of the information on which the allegations of fraud

against Defendants are based because he "previously performed all of the Medicare billing for

one of the suppliers that was involved in the fraudulent billing . . . through" Defendants.

---

[3] Relator asserts in his Local Rule 56.1 Statement of Facts that he voluntarily provided the information to the Government before filing suit. (Statement of facts at 43.) Defendants do not dispute this. Relator has satisfied this portion of the "original source" requirements.

(*Relator's Resp. Memo.* at 15; *Relator's Statement of Uncontested Facts* ¶ 21.) Relator argues that this makes him an original source under the FCA because "[i]n such capacity, [Relator] worked directly with, provided claims and information to, and received information from [Defendants] on a weekly if not daily basis." (*Relator's Resp. Memo.* at 15; *Relator's Statement of Uncontested Facts* ¶ 21.) To support these contentions, Relator cites to two pages of his deposition in which he mentions Defendants only once. (*Relator's Dep.* at 26.) Relator does not cite to any evidence showing a direct knowledge of specific fraudulent claims that Defendants approved in reckless disregard of the falsity of the claims. The deposition testimony reveals that Relator has direct knowledge of fraudulent claims submitted by Illiana, rather than fraudulent claims approved by Defendants allegedly in reckless disregard of the falsity of those claims. Relator has failed to produce any evidence showing that he had direct knowledge of fraudulent claims approved by Defendants. Thus, it cannot be concluded that Relator had "direct" knowledge of specific fraudulent claims approved by Defendants with reckless disregard as to their falsity.

Relator also argues that he is the "original source" of the information that he bases his lawsuit on because he the Government treated him as an "original source" in his previous two *qui tam* actions. He argues that "it is not logical to claim that [he] can . . . lose his status as an 'original source.'" (*Relator's Resp. Memo.* at 15.) Relator's argument is not persuasive. Relator may be correct that he cannot "lose" his status as an "original source" for the prior *qui tam* actions, but it does not necessarily follow that he is an "original source" of the information that he bases the current *qui tam* action on. Relator does not cite to the information that he was the "original source" of in the prior *qui tam* actions. Relator may have been an "original source" of

information showing that the two medical suppliers in his previous *qui tam* actions committed

fraud, but he does not cite to any evidence showing that he had direct and independent

knowledge that Defendants approved fraudulent claims in reckless disregard of the falsity of

those claims.

Moreover, Relator does not have any knowledge of allegedly fraudulent claims approved

by Defendants that is "independent" of the public disclosures. Knowledge is "independent" of a

public disclosure where the relator would have learned of the allegations of fraud absent public

disclosure. *See Houck ex rel. United States v. Folding Carton Admin. Comm.*, 881 F.2d 494, 505

(7th Cir.1989). In this case, all of the information that Relator has regarding the approval of

claims by Defendants is dependent upon the public disclosures, specifically, the July 1998

newspaper article, the criminal indictments obtained by Relator, and the HCFA statistical reports

showing the number of claims approved by Defendants. Without these public disclosures,

Relator would have no reason to suspect that Defendants had continued to approve the

questionable claims after the HCFA and HHS fraud alerts had been released.

Frustratingly, Relator argues that he must have had independent and direct information to

base his claims on because the publicly disclosed documents "fail to name or identify

[Defendants]" and that therefore Relator "obviously had independent information regarding their

identity and their fraudulent behavior." (*Relator's Resp. Memo.* at 15.) Relator does not cite this

"independent information" and this assertion is contrary to his own deposition testimony in

which he acknowledged that "the only thing that [he has] direct and independent knowledge of"

are the "[c]laims filed by Illiana . . . prior to March 15, 1994." (*Relator's Depo.* at 117.) As

explained above, although Defendants were not *specifically named* in the publicly disclosed

documents, they contained sufficient information to *directly identify* them. Relator's ability to match the Defendants' name with the carrier code printed in the HCFA statistical reports does not make Relator an "original source" of the information contained in the HCFA statistical reports.

While Relator may have had independent and direct knowledge of fraudulent billing performed by other defendants in his previous *qui tam* suits, he has failed to produce any evidence showing that he has independent and direct knowledge of fraudulent claims approved by Defendants in the current matter.

## CONCLUSION

Because the allegations of fraud contained in Relator's lawsuit have been publicly disclosed and because Relator is not an original source of that information, this Court does not have jurisdiction over his claims. For the foregoing reasons, Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56 is granted (#23-1). This case is hereby terminated.

**SO ORDERED** 9/27/01          **ENTERED:**

_Ronald A Guzman_

**HON. RONALD A GUZMAN**

**United States Judge**

21